# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

JUSTIN PAUL SULZNER,

    Plaintiff,

vs.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

    Defendant.

No. 21-CV-27-LTS-KEM

**REPORT AND RECOMMENDATION**

_____

    Plaintiff Justin Paul Sulzner, proceeding pro se, seeks judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Sulzner argues that the administrative law judge (ALJ) erred in formulating his residual functional capacity (RFC), focusing too heavily on his activities of daily living during good periods, without considering periods of decompensation that included multiple inpatient hospitalizations. I recommend **reversing** the Commissioner's decision and **remanding** for further proceedings.

## I. BACKGROUND

    Sulzner's serious mental-health problems began in fall 2016 when he was in his mid-forties (he had been previously diagnosed with depression but had not taken medications for years). *See* AR 321-32, 364. At that time, he had been married for around twenty-five years and had three teenage children. AR 39-40, 332. Sulzner had been self-employed for decades; he and his wife the sole owners of a corporation that provided maintenance and cleaning services to government buildings. AR 37-38, 40, 53-54, 351-52, 380-81, 415, 434. Sulzner and his wife handled both the paperwork for the

business as well as performing the cleaning work itself, although they also sometimes hired subcontractors to perform the work. *Id.* Sulzner explained that for jobs in distant states like Virginia, they would hire subcontractors to perform daily or weekly work, but that if the contract required cleaning only every six months or so (for example, for window washing), then Sulzner would travel to perform the work himself. *Id.* Sulzner's earnings reflect the corporation paid him at the level of substantial gainful activity prior to 2011, but not in the years thereafter.[1] *See* AR 171.

On October 16, 2016, Sulzner presented to the hospital at his wife's urging for increased paranoia and bizarre behaviors. AR 322. His wife told providers that Sulzner had been acting distant and believed people were bugging their house, and she became concerned for their family's safety when Sulzner placed a loaded gun behind their couch to fend off any intruders. AR 322, 325. Sulzner's wife and father ultimately obtained a court-ordered commitment after Sulzner attempted to escape from the hospital three times, and he remained on the psychiatric ward for twelve days. AR 322. Sulzner had to be coaxed by his family to speak to providers, ultimately evincing delusions that the government was working against him and that the "world is full of patterns" only Sulzner noticed. AR 330-33. He also noted he had recently placed his family in "some financial distress due to 'trying to get ahead'" but refused to provide details; later treatment records reflect that he had lost money in the stock market on futures and in an online buried treasure group. AR 332-33, 351, 433. The antipsychotic Zyprexa (olanzapine) did not improve Sulzner's symptoms (at a dosage of 20 milligrams), but his condition improved with 15 milligrams nightly of the antipsychotic Haldol (haloperidol). AR 322. Upon discharge, Sulzner's wife agreed to remove the firearms from their home, and Sulzner remained on court-ordered outpatient commitment. AR 263-64, 322.

Sulzner followed up with Douglas Jones, MD, at the Abbe Center on November

---

[1] See Substantial Gainful Activity, Social Security Administration, https://www.ssa.gov/oact/cola/sga.html (last visited Aug. 12, 2022).

8, 2016. AR 351-53. Sulzner said that he had traveled to Colorado several times to find a buried treasure,[2] and he believed several people he encountered randomly while there referred to the treasure. *Id.* Sulzner reported that he had decreased his Haldol dosage from 15 milligrams to 5 milligrams, and he requested a different antipsychotic due to feeling mushy and fatigued on Haldol. *Id.* Dr. Jones prescribed lithium (300 milligrams three times a day) and the antipsychotic Abilify (aripiprazole) (15 milligrams daily), and he referred Sulzner to therapy. *Id.*

Sulzner applied for disability benefits in July 2017. Sulzner remained on outpatient commitment and continued to attend appointments at the Abbe Center through July 2018, seeing Dr. Jones every two months or so (Dr. Jones's treatment records from prior to October 2017 are not in the record). AR 272, 275, 349. During this time, Dr. Jones adjusted Sulzner's medications, and Sulzner tried the following antipsychotics:

- Seroquel (quetiapine), for two short periods—it helped mood but made him fatigued the first time he tried it, and it did not improve mood the second time he tried it;
- Latuda (lurasidone);
- Geodon (ziprasidone), which Sulzner reported lowered his mood;
- olanzapine (in conjunction with Prozac (fluoxetine) (an SSRI)),[3] which ultimately did not improve mood and caused significantly elevated lipids; and
- Risperdal (risperdone), which did not work as well as olanzapine.

AR 349, 369, 429-32. Sulzner also took lithium throughout this time. AR 432. Dr. Jones's treatment records from fall 2017 to July 2018 generally reflect that Sulzner

---

[2] Sulzner's wife said in February 2019 that she believed the treasure was real but dangerous (AR 433), and the ALJ noted at the hearing that someone eventually found the treasure (AR 45).

[3] Selective serotonin reuptake inhibitor.

3

suffered low mood (he reported feeling "blah") but not delusions. AR 347-49, 356-57, 368-69, 429-32. They also show that Sulzner continued to work for the corporation he owned with his wife, even though he did not receive any wages from the corporation after 2017 (and his earnings in 2017, like the preceding six years, did not rise to the level of substantial gainful activity). AR 171; *see* AR 347 (January 2018: noting that he "does building maintenance"; that work was "okay" but sporadic; and that he "puts in data packages for building maintenance"); AR 371 (June 2018: reporting he does "maintenance and cleaning"); AR 427, 430 (early July 2018: noting "[t]hey are working on getting a Government contract" and anxiety related to work; therapist also discussed vocational rehabilitation services with Sulzner); AR 380-81, 431-32 (late July 2018: noting Sulzner reported worrying about an upcoming job and that he would be traveling for work with his wife; Sulzner also said that his job can be stressful and that the only time he has intent to act on his suicidal thoughts is when he is working a stressful job); AR 493 (August 2018: reporting he works in building maintenance and does contract work for federal government). In his last appointment with Dr. Jones in late July 2018, Dr. Jones prescribed Ativan (lorazepam) for anxiety, and he suggested that Sulzner obtain a second opinion from the Mayo Clinic, as Sulzner might be a good candidate for transcranial magnetic stimulation or electroconvulsive therapy. AR 432.

In August 2018, Sulzner met with a new psychiatrist at the University of Iowa Hospital (and his outpatient commitment was transferred to there from the Abbe Center). AR 243, 392-94. At that time, he was taking lithium and lorazepam, but not an antipsychotic. AR 392. He and his wife reported that his depression had worsened the last two months. AR 392-94. The psychiatrist restarted quetiapine at a higher dosage, noting that Sulzner's wife thought it improved both his affect and sleep (Sulzner thought it made him more anxious, but he had also been under more work stress at the same time). *Id.* At his follow-up appointment the next month, Sulzner's wife noted his anxiety and sleep had both improved with quetiapine. AR 407. She also reported that she

4

Case 1:21-cv-00027-LTS-KEM    Document 40    Filed 08/19/22    Page 4 of 13

recently had to take over work on one of the contracts, as the client felt Sulzner "was micromanaging too much." *Id*. The psychiatrist increased Sulzner's quetiapine dosage and noted if Sulzner continued to feel depressed, an antidepressant would be prescribed at the next visit. AR 409-10.

The next treatment note in the record is from the Abbe Center in February 2019, but the record appears to be missing treatment notes—in the interim, Sulzner was prescribed Zoloft (sertraline) (an SSRI). *See* AR 239. In February 2019, Sulzner suffered another manic episode (observed by both his wife and therapist) in which he thought people were after him. AR 433, 437; *see also* AR 296. Sulzner demonstrated paranoid thoughts and poor insight and judgment, and his quetiapine and lithium dosages were increased. AR 300, 435, 437. At his next therapy appointment in March 2019, Sulzner was "hesitant to state that he feels better due to [the] increase in his medications," but he admitted he was "okay" but "really tired." AR 437.

Sulzner had another therapy appointment in mid-April 2019, in which he noted his antidepressant dosage had recently been increased. AR 439. His wife noted that over the last few weeks, Sulzner had been irritable, and there were times when he was "not himself." *Id*. The therapist observed that at times during the session, Sulzner was distant and slightly irritated. *Id*.

Sulzner returned to therapy with his wife in late May 2019. AR 441-42. His wife reported that he had not been doing well the last couple of days, and the therapist observed that he seemed irritated with his wife at times during the session. *Id*. The therapist noted Sulzner was reluctant to discuss his mood and was "able to identify that he does not want to discuss his mood when he is sad and just 'laying around.'" *Id*.

Shortly thereafter, Sulzner suffered another manic episode that resulted in several hospitalizations throughout summer 2019. Sulzner was hospitalized from June 10 until "mid-June" at St. Anthony Regional Hospital in Carroll, Iowa (Sulzner testified that he was hospitalized for three days). AR 42, 422, 435, 443, 457. Prior to this

5

hospitalization, Sulzner let the air out of his wife's tires (or slashed them) so that he could beat her to the bank, then drained their joint bank account. *Id*. He also canceled his cell phone service. *Id*. His wife called the police, and Sulzner was hospitalized on an emergency hold. *Id*. The record does not contain treatment notes from this hospitalization (or any of the 2019 hospitalizations), nor treatment notes from Sulzner's psychiatrist leading up to this time. A July 2019 commitment record noted this manic episode was caused directly by recent medication changes, including cutting his lithium in half and tapering him off his antipsychotic medication; that note also reflects Sulzner reported he does not always take his medications because he likes feeling "revved up" and "high." AR 422; *see also* AR 443 (June 20, 2019 therapy note reflects he had stopped taking his medications prior to hospitalization); AR 416 (July 2, 2019 commitment note reflects Sulzner "miss[ed] a few days of medication prior to his first admission" but had been compliant with treatment since).

After his release from the hospital, Sulzner attended therapy on June 20 accompanied by his wife; that treatment record does not reflect any delusions or signs of mania (his objective examination was normal other than depressed and quiet mood and "ok" insight and judgment). AR 443. But a later treatment note reflects that after his first discharge from St. Anthony in mid-June, Sulzner "disappeared into a hotel for several days, during which time he drafted an ACLU[4] complaint letter which described an ongoing government infiltration into the Jehovah's Witnesses" to destroy them (Sulzner is a Jehovah's Witness). AR 421. This note also described Sulzner as "belligerent and hostile" during this time. *Id*. Sulzner was again placed on an emergency hold and hospitalized at St. Anthony sometime between June 20 and July 2 (Sulzner testified that this hospitalization lasted for three days). AR 42, 425.

A commitment record from July 2, 2019, completed by a psychiatrist at St.

---

[4] American Civil Liberties Union.

Anthony, recommended that Sulzner remain on outpatient commitment through the University of Iowa Hospital (to ensure he took his medications and could not access weapons). AR 415-17. The doctor noted that while Sulzner suffered from significant delusions ("somewhat persecutory," but nonbizarre), he was nonviolent, and he understood that violence would land him in prison. *Id.* The doctor noted Sulzner had not refused his medications while hospitalized and opined that Sulzner deserved a chance at taking his medications voluntarily without the use of a long-acting injectable. *Id.* For Sulzner's occupation, the doctor wrote "part-time self-employment." *Id.*

The following week, on July 8, 2019, a psychiatrist with the University of Iowa Hospital submitted a recommendation to the court that Sulzner once again needed inpatient commitment. AR 425-26. The psychiatrist noted that Sulzner was suffering from increased agitation, irritability, and delusions, and set out Sulzner's conduct the prior month in withdrawing a large sum of money after preventing his wife from driving to the bank. *Id.* The psychiatrist also said that Sulzner was refusing to submit to court-ordered treatment and believed his wife was trying to kill him and keep him institutionalized. *Id.* The court ultimately ordered Sulzner's hospitalization at the University of Iowa Hospital. AR 414.

Sulzner was hospitalized for about three weeks, from July 8, 2019, to the beginning of August. AR 418-19, 421-23. A status report to the court from July 17 reflects that Sulzner still thought he was under government surveillance based on his security clearance and because he was a Jehovah's witness; that he sent hostile and demanding emails to providers related to disclosing his medical records; and that although he was pleasant and cooperative with the treatment team, he lacked insight into his past actions and did not think he needed to be hospitalized. AR 422-23. By the end of July, however, after treatment with lithium, quetiapine, and risperidone, Sulzner demonstrated insight and was no longer delusional. AR 419.

In late August, Sulzner's wife obtained a conservatorship over Sulzner. AR 167-

7

Case 1:21-cv-00027-LTS-KEM    Document 40    Filed 08/19/22    Page 7 of 13

68. At the conservatorship hearing on August 26, Sulzner's wife noted they were legally separated but had no plans to obtain a divorce. *Id.* She said that they shared assets and a business and that Sulzner was unable to carry out important financial decisions due to his erratic behavior. *Id.* She also noted that Sulzner was currently hospitalized (this is the only reference to this hospitalization in the record, other than Sulzner's testimony at the hearing that he was hospitalized for three days in Waterloo). *Id.*; *see* AR 42.[5]

After summer 2019, Sulzner's mental-health symptoms did not result in any more hospitalizations. He attended psychiatric medication-management appointments in September, November, and December 2019 and February 2020; and therapy in January 2020. AR 445-49, 470-71, 481-83. These records reflect that Sulzner's relationship with his wife had deteriorated: he lived alone (first living in his car before getting an apartment in October 2019); he described their divorce proceedings as contentious; and his wife called Sulzner's provider before several appointments, noting in September 2019 that his medications should be adjusted further and in October 2019 that she worried Sulzner would murder her or their children (she was directed to call the police if that was how she felt). *Id.* Sulzner remained subject to an outpatient commitment (prescribed lithium and quetiapine) and a conservatorship, although he reported the latter would end when his divorce was finalized. *Id.* As for employment, Sulzner mentioned "building his business" in December 2019; "trying to start" a handyman business but spending most of his time online researching legal issues in January 2020; and that work was going well in February 2020 (Sulzner testified at the hearing that his wife paid his rent through the conservatorship for a while and that he used savings after that). *Id.*; AR 41. Objective mental status examinations were mostly normal, although his provider noted in September 2019 that despite being open and honest, he lacked insight and was dismissive at times

---

[5] Sulzner moved to supplement the record before the court with the August 2019 hospitalization records from Waterloo, but the court denied the motion, as it must consider only the evidence before the administrative agency. *See* Docs. 34, 39.

(he showed significant insight at his appointment the next month); and in February 2020, that he was guarded, visibly irritable, and had fair insight and judgment. AR 445-49, 470-71, 481-83.

The Social Security Administration denied Sulzner's disability application on initial review (in July 2018) and on reconsideration (in December 2018). AR 63-91. Sulzner requested review by an ALJ, and the ALJ held a hearing on June 11, 2020, at which both Sulzner and a vocational expert testified. AR 30-31. On June 24, 2020, the ALJ issued a written decision following the familiar five-step process outlined in the regulations[6] to determine whether Sulzner was entitled to disability benefits. AR 10-20. The ALJ found Sulzner suffered from the following severe impairments: bipolar disorder, depression, anxiety, and unspecific psychosis. AR 13. To aid in the evaluation whether Sulzner could work, the ALJ determined he had the following RFC[7]:

> [Sulzner] has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: He can perform simple, routine tasks in work where any changes are predictable. He can occasionally interact with co-workers and with the public.

AR 15. Relying on a VE's testimony, the ALJ found that Sulzner could not perform his past relevant work, but that a significant number of other jobs existed in the national economy that Sulzner could perform, such as floor waxer, industrial sweeper/cleaner, or

---

[6] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. § 404.1520(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[7] RFC means "the most that a claimant can do despite her limitations." *Sloan v. Saul*, 933 F.3d 946, 949 (8th Cir. 2019) (citing **20 C.F.R. § 404.1545(a)(1)**).

conveyer feeder offbearer. AR 18-19. Accordingly, the ALJ concluded that Sulzner was not disabled. AR 19.

Sulzner appealed. The Appeals Council denied Sulzner's request for review on January 7, 2021 (AR 1-3), making the ALJ's decision the final decision of the Commissioner.[8] Sulzner filed a timely complaint in this court seeking judicial review of the Commissioner's decision (Docs. 1, 3, 5).[9] The parties briefed the issues (Docs. 5, 36, 37), and the Honorable Leonard T. Strand, Chief United States District Judge for the Northern District of Iowa, referred this case to me for a report and recommendation.

## II. DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole."[10] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[11] The court "do[es] not reweigh the evidence or review the factual record de novo."[12] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[13]

Sulzner argues that the ALJ erred in focusing too heavily on his "good periods" without considering all of his inpatient hospitalizations. I agree. The ALJ found that Sulzner had only been hospitalized two times, in October 2016 and July 2019. *See* AR

---

[8] *See* **20 C.F.R. § 404.981**.

[9] *See* **20 C.F.R. § 422.210(c)**.

[10] *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**.

[11] *Kirby*, 500 F.3d at 707.

[12] *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

[13] *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

16. Sulzner testified that he had three other inpatient hospitalizations for around three days each, but the Commissioner argues the ALJ properly discounted that testimony as unsubstantiated. First, Social Security administrative proceedings are nonadversarial, and an ALJ has a duty to fully and fairly develop the record, even when the claimant is represented by counsel.[14] Thus, the Commissioner's argument that the ALJ could discount Sulzner's testimony because the record does not contain these treatment notes is not well-taken. Second, the available records do corroborate these hospitalizations. *See* AR 443 (June 20, 2019: discussing recent hospitalization); AR 425 (July 8, 2019: noting that he had been hospitalized twice in the past month); AR 422-23 (July 17, 2019: noting that Sulzner was admitted to St. Anthony on June 10, that his "first discharge" was in mid-June, and that he had recently had two hospitalizations in Carroll, Iowa (where St. Anthony is located)); AR 168 (late August 2019: noting Sulzner was presently hospitalized).

That Sulzner was in and out of the hospital for three months from June to August 2019 makes a difference. The ALJ essentially found Sulzner stopped taking his medications, was hospitalized, then stabilized. *See* AR 16. But in actuality, Sulzner stopped taking his medications (likely triggered by his psychiatrist's medication adjustments), and his manic symptoms and delusions did not improve until he had been hospitalized four different times over a period of three months. Furthermore, treatment records from early 2019 reflect that Sulzner suffered a manic episode around that time as well (although it did not require hospitalization). AR 437, 493.

The ALJ found that after his 2019 inpatient commitment, Sulzner's mental status examinations were normal other than depressed mood and tired affect. AR 17. The ALJ did not recognize that some treatment records from the latter half of 2019 and early 2020 reflect Sulzner's irritability, limited insight, and guardedness—suggesting that Sulzner

---

[14] *See, e.g.*, **Snead v. Barnhart**, 360 F.3d 834, 838 (8th Cir. 2004).

may have been suffering continued delusions or manic symptoms that he declined to share with his providers. In addition, the ALJ noted Sulzner reported work was going well in February 2020 (AR 17), but other treatment records from around this time suggest that Sulzner was not working as much as he had prior to 2019 (i.e., he reported in January 2020 being too busy researching legal issues to work; it is unclear what these legal issues were).

Here, the record supports that Sulzner's mental health decompensated in 2019—he required multiple inpatient hospitalizations, the record stops containing references to his work for the corporation he shared with his wife, and he separated from his wife after almost thirty years of marriage. And although his symptoms ultimately improved, he did not appear to return to his baseline from years prior.

I recommend finding that the ALJ focused too heavily on Sulzner's good periods and that substantial evidence does not support the ALJ's resulting RFC determination for the entire relevant period. I recommend remanding this case for further consideration of Sulzner's "bad periods," particularly in 2019 and onward. The ALJ should consider and discuss whether Sulzner's RFC determination should account for Sulzner's manic episodes, such as a limitation related to unscheduled absences.[15] The ALJ should also develop the record and obtain the missing treatment records discussed in the background section of this opinion (hospital records and psychiatric medication provider records).

---

[15] *Compare* **Lacina v. Astrue**, No. 3:09-cv-00124, 2010 WL 3732936, at *1, *8 (S.D. Iowa Sept. 17, 2010) (holding that when claimant was hospitalized three times, for three weeks in May 2005, one day in July 2006, and one week in April 2007, during relevant time period covering 2003 to 2008, ALJ did not err in failing to include RFC limitation related to unscheduled absences, since the claimant's hospitalizations were not frequent and recurrent), *with* **Frederick v. Berryhill**, 247 F. Supp. 3d 1014, 1023-24, 1034 (E.D. Mo. 2017) (holding that substantial evidence did not support ALJ's failure to include an RFC limitation related to unscheduled absences when the claimant was hospitalized twice in 2010, once in 2011, four times in 2012, and two times in the first half of 2013).

### III. CONCLUSION

I recommend **reversing** the Commissioner's decision and **remanding** this case to the Social Security Administration for further proceedings.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. **Fed. R. Civ. P. 72**. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DATED** August 19, 2022.

_____
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa